IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Gwendolyn Delores Johnson, )<br>    Plaintiff, )<br> )<br>    vs. )<br> )<br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security, )<br> )<br>    Defendant. )<br>_____) | Civil Action No. 6:15-4419-RBH-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on July 19, 2012, alleging that she became unable to work on October 23, 2010. The applications were denied initially and on reconsideration by the Social Security Administration. On July 10, 2013, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Tonetta Watson-Coleman, an impartial vocational expert, appeared on May 6, 2014,

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

considered the case *de novo*, and on May 30, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on October 5, 2015. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through September 30, 2015.

(2)    The claimant has not engaged in substantial gainful activity since October 23, 2010, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: back disorder and pain from cancer surgery (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). Specifically, the claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours each in an 8-hour work day. The claimant cannot climb ladders, ropes, or scaffolds, but she can occasionally climb ramps and stairs. She can frequently balance and reach overhead bilaterally. The claimant can occasionally stoop, kneel, crouch, and crawl. Additionally, she must avoid concentrated exposure to moving machinery and unprotected heights.

(6)    The claimant is capable of performing past relevant work as a housekeeper. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

2

(7)     The claimant has not been under a disability, as defined
in the Social Security Act, from October 23, 2010, through the
date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually

3

performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the

4

conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 52 years old on her alleged disability onset date and 56 years old on the date of the ALJ's decision (Tr. 51). She has a seventh or eighth grade education, has never received a GED, and has past relevant work as a housekeeper (Tr. 39).

The plaintiff underwent a right breast lumpectomy and axillary dissection in 1989 followed by radiation (Tr. 303, 319). In July 2001, the plaintiff underwent a right mastectomy. In May 2006, the plaintiff underwent a right axillary mass resection followed by Lupron plus Femara treatment, Tamoxifen, another course of Femara, and Arimidex (Tr. 319).

Treatment notes from January 12, 2010, showed that the plaintiff could not afford Arimidex, and she was switched to Femara. The plaintiff denied any focal bone pain, abdominal pain, abdominal distention, early satiety, nausea, vomiting, fevers, chills, bruising, or bleeding. Although she reported increasing fatigue and tiredness, she did not display any new adenopathy, right chest wall nodules, or left breast masses (Tr. 334). Her thyroid was prominent with symmetrical enlargement. At this time, the plaintiff was assessed as doing well with regard to her breast cancer (Tr. 335).

On February 16, 2010, she complained at the Medical University of South Carolina ("MUSC") emergency department of back pain and right leg swelling diagnosed as flank pain (Tr. 291-92). She followed up with her primary care physician on February 28, 2010. Exam noted tenderness and spasm in the lumbar spine. Gait, balance, and strength were all normal. Assessment was lower back muscle spasm (Tr. 400-401).

The plaintiff returned to the MUSC cancer clinic on May 17, 2010. She had recent non-specific back pain. A thoracic MRI had shown no evidence of metastatic

5

disease.  A thyroid ultrasound from January showed borderline enlarged thyroid with scattered cysts bilaterally.  She was switched back to tamoxifen to complete adjuvant endocrine therapy due to not tolerating letrozole well (Tr. 314-17, 332-33).  A May 2010 mammogram did not reveal any abnormalities (Tr. 426)

On November 4, 2010, the plaintiff treated with her primary care group, and upon examination, she had a full range of motion, no tenderness in her back, normal gait, normal balance, and normal motor strength.  She was diagnosed with diabetes mellitus and was started on Metformin at Palmetto Primary Care Physcians (Tr. 395-96).  The plaintiff treated with her primary care practice group again on November 11, 2010, for followup (Tr. 389-91). At this time, with regard to her musculoskeletal exam, the plaintiff had a full range of motion and presented with a normal gait and balance. The plaintiff reported that she had gone to the emergency room for weakness, the clinician noted that her blood pressure now looked better, and with regard to this, she admitted that she had not been compliant before in taking her medication (Tr. 390-91). On November 10, 2010, the plaintiff complained of chest pain; however, a subsequent EKG was normal with a left ventricular ejection fraction of 73% (Tr. 429).

On December 3, 2010, the plaintiff treated with physician's assistant Shirley Ho, and she again had a full range of motion, normal gait, and normal balance (Tr. 388). At this time, the plaintiff denied having joint or back pain (Tr. 387).

Treatment notes from December 2010 and May 2011 showed the plaintiff continued to do well with no evidence of new, recent, or metastatic breast cancer.  She was prescribed refills of Tamoxifen (Tr. 327, 329-30).

On December 17, 2010, the plaintiff visited the MUSC Breast Cancer Clinic and reported pain in the right chest and axilla in the area of the scars.  She was prescribed amitriptyline for pain and continued on Tamoxifen (Tr. 393-94).

6

The plaintiff treated with her primary care group on February 21, 2011, and she complained of arm, hand, and neck pain (Tr. 384). Although the plaintiff had a positive Phalens and Tinel's on the right, she had full range of motion and a normal gait and balance (Tr. 385). She had a weak right grip and was dropping things out of her hand. She was diagnosed with carpal tunnel syndrome (Tr. 384-86). She underwent an EMG/NCS on March 1, 2011, that suggested high moderate carpal tunnel syndrome bilaterally (Tr. 272).

On March 8, 2011, the plaintiff treated with her primary care practice group, complaining of shoulder pain. She presented with a normal gait, balance, and motor strength. Physician's assistant Shirley Ho assessed sub deltoid bursitis on the left (Tr. 382-83).

On March 14, 2011, she was evaluated by Dr. Christopher Brooker for bilateral carpal tunnel syndrome that had not resolved with conservative management. The plaintiff also had a year long history of intermittent locking and catching affecting the right long and ring fingers. Dr. Brooker found swelling and tenderness around the A1 pulley of the long finger and mild tenderness along the ring A1 pulley. There was a positive Tinel's sign and positive compression over the carpal tunnel. Dr. Brooker administered a steroid injection into the left carpal tunnel. He recommended surgery for the right carpal tunnel and right trigger digits (Tr. 265-66).

On April 6, 2011, the plaintiff underwent a right carpal tunnel release with right ring finger and long finger digit release (Tr. 267-68). The plaintiff did well following surgery, but she complained about symptoms returning on her left hand after steroid treatment in March. She was given another steroid injection to the left wrist and a removable wrist brace to wear at night (Tr. 259).

The plaintiff treated with her primary care practice group on August 31, 2011, and although she complained of low back pain, she presented with a normal gait and station (Tr. 372-73).

7

The plaintiff had an esophagogastroduodenoscopy ("EGD") performed on September 8, 2011 (Tr. 424-25). The report noted that there was no specific etiology for the epigastric pain (Tr. 422). On September 9, 2011, the plaintiff treated with her primary care physicians who noted a diagnosis of adult onset diabetes,[2] but that it was controlled. She had a normal gait and balance, no tenderness in her spine, and had negative straight leg raising tests (Tr. 370-71).[3]

The plaintiff treated with James Keffer, M.D., on October 21, 2011, for left-sided low back and lower extremity pain. She reported the pain could be as severe as 10/10 and was aggravated with bending, lying on the left side, and increased physical activity. The plaintiff reported that she was unemployed since November 2010 and smokes a half a pack of cigarettes per day, and had been doing so for 41 years, but did not drink alcohol or use drugs. The plaintiff had intact gait, was able to heel-toe stand, and had normal 5/5 bilateral lower extremity strength. Dr. Keffer noted some tightness in the plaintiff's hamstrings when performing the supine straight leg raising test, but nothing that radiated to the lower extremity. He further observed that the plaintiff's hip and knee range of motion were in functional limits, and there was significant tenderness when palpating the region of the left greater trochanter and mild left paraspinal muscles. Dr. Keffer assessed persistent recurrent moderate to severe left-sided low back pain with associated bilateral lower extremity pain resembling possible L5 radiculitis; diabetes; hypertension; history of

---

[2] An eye examination from November 8, 2010, showed that the plaintiff's right and left eye were fully assessable, with no retinopathy (Tr. 440). An eye exam dated February 13, 2012, showed that although the plaintiff had cataracts, she had no background of diabetic retinopathy. With regard to the plaintiff's cataracts, the physician opined that they were not visually significant enough to impair the plaintiff's lifestyle to warrant the small risk of surgery (Tr. 441).

[3] A treatment note from March 2011 stated that the plaintiff was doing well since attending diabetes education and had dropped from a size 20 to a size 16 (Tr. 419).

8

breast cancer; and nicotine dependency.  He noted that he was ordering an MRI of the plaintiff's lumbar spine and prescribed Neurotin (Tr. 278-79).

On November 10, 2011, the plaintiff treated with Joe McTavish, P.A., and complained of persistent low back pain that radiated to her bilateral lower extremities.  An MRI of her lumbar spine showed moderate narrowing of the spinal canal at L4-5, a small annular fissure with some degree of mass effect upon the right S1 nerve root at L5-S I, and a tiny uterine fibroid.  X-rays of the plaintiff's lumbar spine revealed multi-level degenerative disc disease with no evidence of fracture.  Upon examination, the plaintiff exhibited tenderness to palpation of the left greater trochanter region and mid-left lumbar paraspinal muscles; however, she ambulated with an intact gait.  Mr. McTavish assessed persistent recurrent moderate to severe left-sided low back pain with associated bilateral lower extremity pain resembling possible L5 radiculitis.  She was prescribed Ultracet, and Mr. McTavish noted that the plaintiff would get some conservative treatment that included physical therapy for her back and leg pain (Tr. 281-82).

An MRI of the plaintiff's lumbar spine from December 28, 2011, showed mild broad-based disc protrusion that did not touch the exiting nerve root at L3-L4; bilateral facet arthropathy and a broad-based disc extrusion that gently abuts the right exiting nerve root at L4-L5; disc protrusion and facet arthropathy, touching the right greater than the left nerve roots, and mild narrowing with the right neuroforamina touching the right exiting nerve root with mild spinal canal narrowing at L5-S1(Tr. 298). A December 2011 bone density examination was normal (Tr. 301).

On February 13, 2012, the plaintiff treated with physician's assistant Shirley Ho and complained of ongoing low back pain with radiation to her right leg.  Upon examination, the plaintiff ambulated with a normal gait, and she displayed normal balance and motor movements. Ms. Ho referred the plaintiff to physical therapy (Tr. 365).  Physical therapy treatment notes from February through April 2012 demonstrate that the plaintiff

responded well to treatment and that her symptoms improved (Tr. 508-21). For example, a progress note from physical therapy dated March 23, 2012, noted that the plaintiff improved 70% and was progressing (Tr. 515); a note from April 26, 2012, stated that the plaintiff was doing "great" (Tr. 510); and another note from April 30, 2012, noted that the plaintiff had an "[e]xcellent response" to treatment and stated that the plaintiff had no pain (Tr. 509).

By May 2012, the claimant finished adjuvant endocrine therapy, and reported feeling better with less aching sensations with Tamoxifen treatment (Tr. 320). A subsequent mammogram did not show any evidence of malignancies (Tr. 306). The plaintiff complained of tightness and spasms in the right axilla and she exhibited tightening in the right chest wall and right axilla with a decreased range of motion. Her physician recommended physical therapy for the plaintiff's right arm (Tr. 320).

On May 16, 2012, the plaintiff complained of depression for months and low back pain with radiation down the right leg. She reported that her back pain was improving, and Ms. Ho opined the plaintiff's back pain resolved with physical therapy and that she was no longer taking analgesics  (Tr. 359-62).

On May 22, 2012, the plaintiff visited the MUSC Breast Cancer Clinic and reported ongoing issues with tightness and spasms in the right axilla (Tr. 319-20). On exam, there was extensive tightening in the right chest wall and right axilla with decreased range of motion. She no longer had Medicaid coverage for physical therapy for her right arm.

In June 2012, although the plaintiff presented with a normal gait, she reported worsening back pain, and she was prescribed Butrans patches for her symptoms (Tr. 356-58).

The plaintiff was prescribed low dose Butrans patch at Palmetto Primary Care Physician for worsening back pain on June 6, 2012 (Tr. 356-58).

10

On June 14, 2012, an MRI of the lumbar spine revealed contact of the exiting right L5 nerve root and traversing right S1 nerve root at L5-S l secondary to multi- factorial degenerative change (Tr. 431).

On June 20, 2012, the plaintiff reported that she had been unable to get Butrans patch filled.  She was prescribed Lortab and referred to neurosurgery (Tr. 353-55).

On November 27, 2012, the plaintiff re-established care at Franklin C. Fetter Family Health Center for diabetes and hypertension.  She had been unable to return to Palmetto Primary Care due to loss of insurance in July.  On exam, she had decreased bilateral breath sounds.  She was assessed with uncontrolled diabetes mellitus, asthma, hypertension, and tobacco abuse.  Referrals were made to a lung specialist and ophthalmology (Tr. 541-43).

The plaintiff had a consultative orthopedic examination with Thaddeus J. Bell, M.D., on January 23, 2013.  Dr. Bell observed that the plaintiff exhibited a normal range of motion throughout her lumbar spine with minimal pain.  She had a history of degenerative disc disease, diabetes, history of breast cancer and depression.  She was overweight at 5 feet 3 inches and 187 pounds.  She appeared to be somewhat depressed.  He found pain in the right shoulder and right elbow.  He noted that the plaintiff had pain and a decreased range of motion in her hips, but also noted that the range of motion in her knees and ankles was normal.  Although the plaintiff's straight leg raising test was positive at 40 degrees bilaterally in the seated position, the test was negative bilaterally in the supine position.  She struggled to perform tandem walking and heel-to -toe walking.  The plaintiff ambulated with a slow, but normal gait without an assistive device and displayed 5/5 strength in her extremities.  Dr. Bell observed that there was no evidence of any sensory loss, atrophy, or joint abnormalities, and the plaintiff's deep tendon reflexes were 2+ and symmetrical.  In addition, he noted that there was no evidence of sciatic pain.  Based on his examination,

11

Dr. Bell assessed that the plaintiff did not appear to have significant back pain that limits her from working (Tr. 534-37).

On February 1, 2013, state agency physician Carl Anderson, M.D., reviewed the plaintiff's records and assessed that the plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently; sit about six hours in an eight-hour workday; stand about six hours in an eight-hour workday; frequently balance, kneel, and reach overhead frequently on the right; and occasionally climb ramps or stairs, stoop, crouch, and crawl; but never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards. Dr. Anderson noted that his findings were consistent with the findings at the consultative examination, most recent exams, and imaging studies. He further assessed that the plaintiff's diabetes and blood pressure were well controlled and not severe (Tr. 61).

On February 4, 2013, the plaintiff presented to Franklin C. Fetter with right elbow epicondylar pain that was severe with motion (Tr. 544-46). On February 28, 2013, the plaintiff exhibited a normal range of motion, muscle strength, and stability in all extremities with no pain upon inspection (Tr. 549). On March 18, 2013, the plaintiff presented to the emergency room with complaints of low back pain, and she displayed tenderness to palpation of the lumbar paraspinals; however, she exhibited a normal range of motion in all extremities and was able to move all of her extremities without difficulty (Tr. 564-65). The clinician assessed the plaintiff with sciatica and a muscle spasm, she was discharged as "much improved," and she was given prescriptions for Valium, Oxycodone, and Prednisone for pain and inflammation (Tr. 565-66).

On April 24, 2013, state agency physician Isabella McCall, M.D., reviewed the plaintiff's records and assessed that the plaintiff could lift and/or carry 20 pounds occasionally and ten pounds frequently; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour work day. With regard to postural activities, Dr. McCall noted that the plaintiff could frequently balance; occasionally climb

12

ramps or stairs, stoop, kneel, crouch, and crawl; but never climb ladders, ropes, or scaffolds (Tr. 77-78). Dr. McCall also assessed that the plaintiff's overhead reaching was limited on the right (Tr. 78). She further assessed that the plaintiff should avoid concentrated exposure to hazards. Dr. McCall opined that the plaintiff's diabetes and blood pressure were well controlled and not severe. Further, Dr. McCall noted that the plaintiff's statements regarding the severity of her symptoms, particularly her statements noting she cannot bend, stand, lift more than 15 pounds, and can only walk a block were not fully credible, and the available evidence did not support the alleged level of severity (Tr. 79).

On June 20, 2013, the plaintiff returned to Franklin C. Fetter with back pain and spasm to lower right arm. She was prescribed Prednisone and Tramadol (Tr. 572-75). The plaintiff exhibited a normal range of motion, muscle strength, and stability in all extremities with no pain upon inspection (Tr. 574).

On October 10, 2013, the plaintiff followed up for gallstones, coughing, and a possible sinus infection; however, the plaintiff testified that she could not afford gallbladder surgery. Assessments included asthma, cough, uncontrolled hypertension, and bronchitis.(Tr. 44-45, 576-79).

The plaintiff testified at the administrative hearing that she lives by herself in an apartment but that her nephew was living with her to "help out" as much as he could (Tr. 38). The plaintiff testified that she stopped working due to problems in her back and right arm swelling from a previous surgery (Tr. 40). She testified that she can fix herself simple meals in the microwave, and she can fold clothes for a short amount of time before having to take a break (Tr. 46). The plaintiff had undergone surgery for breast cancer and had suffered nerve damage on the right side (Tr. 41). She had a carpal tunnel release on the right, but then began to have symptoms on her left side. This caused pain and difficulty with her grip (Tr. 42). She was diabetic and testified that she had pain in her feet (Tr 43). Because she was uninsured, the plaintiff was unable to get adequate care. She needed

13

gallbladder surgery, but also was scheduled for a biopsy of her lymph nodes (Tr. 44). She suffered abdominal pain due to her gallbladder (Tr. 45).

In a function report dated September 19, 2012, the plaintiff reported that she goes out twice a week for shopping, and her girlfriend drives and helps her with shopping (Tr. 209). The plaintiff further reported that she watches television and visits with friends who come to her house (Tr. 210).

The vocational expert testified that the plaintiff's past work was as a housekeeper, which is light in exertion and unskilled with a specific vocational preparation ("SVP") of 2 (Tr. 47). The ALJ asked the vocational expert to assume a hypothetical individual with the plaintiff's age, education, and work experience who could do light work, with no climbing of ladders ropes or scaffolds; occasional climbing of ramps or stairs, stooping, crouching, kneeling and crawling; and frequent balancing and overhead reaching bilaterally, but avoidance of moving machinery and unprotected heights. The vocational expert testified that such a person could perform the plaintiff's past relevant work as a housekeeper (Tr. 48).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to perform a function-by-function residual functional capacity ("RFC") analysis supported by substantial evidence and (2) failing to properly evaluate her subjective complaints.

### *Residual Functional Capacity*

The plaintiff first argues that the ALJ failed to perform a function-by-function RFC analysis, and the RFC finding is not supported by substantial evidence (pl. brief 8-10). Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§

14

> 404.1545 and 416.945. Only after that may RFC be expressed
> in terms of the exertional level of work, sedentary, light,
> medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1.  The ruling further provides:

> The RFC assessment must include a narrative discussion
> describing how the evidence supports each conclusion, citing
> specific medical facts (e.g., laboratory findings) and nonmedical
> evidence (e.g., daily activities, observations).  In assessing
> RFC, the adjudicator must discuss the individual's ability to
> perform sustained work activities in an ordinary work setting on
> a regular and continuing basis (i.e., 8 hours a day, for 5 days a
> week, or an equivalent work schedule), and describe the
> maximum amount of each work-related activity the individual
> can perform based on the evidence available in the case
> record.  The adjudicator must also explain how any material
> inconsistencies or ambiguities in the evidence in the case
> record were considered and resolved.

Id. at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of

why reported symptom-related functional limitations and restrictions can or cannot

reasonably be accepted as consistent with the medical and other evidence." Id.  Moreover,

"[t]he RFC assessment must always consider and address medical source opinions.  If the

RFC assessment conflicts with an opinion from a medical source, the adjudicator must

explain why the opinion was not adopted."  Id.

The plaintiff specifically contends that the ALJ's RFC assessment is flawed

because "he failed to address his findings in regard to some of the basic requirements of

light work, namely standing, walking, and lifting" (pl. brief at 8). The plaintiff argues that the

ALJ failed to be clear in stating what evidence he was relying on in finding that she could

stand and walk for six hours each in an eight-hour day and lift and carry up to 20 pounds

occasionally and ten pounds frequently (id. at 8-10; see Tr. 24).   The undersigned

disagrees.

In Mascio v. Colvin , 780 F.3d 632 (4th Cir. 2015), the Fourth Circuit Court of

Appeals held that remand was warranted in part because the ALJ's RFC assessment did

15

not include a function-by-function analysis of the claimant's work-related abilities under SSR 96-8p. *Id*. at 636-38. The Fourth Circuit found that, although the ALJ had determined what functions he believed Mascio could perform, the ALJ's articulation was "sorely lacking in the analysis." *Id*. at 636. In so finding, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis" but found that "'remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Id*. (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)).

In *Monroe v. Colvin*, 826 F.3d 176 (4th Cir. 2016), the Fourth Circuit again noted that it had not adopted a per se rule but found that, because the ALJ in that case failed to consider how the claimant's narcolepsy and apnea affected his ability to work, remand was necessary. *Id*. at *188. The court emphasized that "'a necessary predicate to engaging in a substantial evidence review is a record of the basis for the ALJ's ruling,' including 'a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Id*. at 189 (quoting *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)). Thus, the ALJ "'must build an accurate and logical bridge from the evidence to his conclusion.'" *Id*. (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

As argued by the Commissioner, the ALJ built a logical bridge in his analysis of the plaintiff's RFC and referenced not only the treatment records, but also the consultative exam and state agency assessment, which supported the RFC of a range of light work (Tr. 24-29). Here, the ALJ thoroughly discussed all of the relevant evidence (Tr. 26-28). In assessing the plaintiff's RFC, the ALJ specifically discussed the plaintiff's complaints of limitation (Tr. 25), the MRIs of her back (Tr. 26), her treatment notes throughout the relevant period that consistently showed her normal gait, range of motion,

16

muscle strength, balance, and motor movements (Tr. 25-28), her positive response to physical therapy (Tr. 26-28), the state agency assessment (Tr. 29), the consultative examination (Tr. 28-29), as well as later treatment notes (Tr. 27), all of which supported her ability to perform the walking, standing, and lifting functions of a range of light work.

The ALJ noted that the plaintiff maintained that her back and right arm pain prevented her from working and that the medical evidence of record indicated that the plaintiff has received treatment for her severe impairments since the alleged onset date (Tr. 25). However, the ALJ concluded that the plaintiff experienced significant relief from physical therapy and treatment (Tr. 27-28). In reaching this conclusion, the ALJ considered the treatment notes, physical therapy notes, the consultative examination, and the state agency assessments (Tr. 25-28). As pointed out by the ALJ, although the plaintiff had muscle tenderness in her back, she consistently ambulated with a normal gait (Tr. 25-26; *see* Tr. 281, 365, 536) in evaluations and treatment. In addition, as the ALJ noted, physical therapy treatment notes from February through April 2012 demonstrate that the plaintiff's back issue responded well to treatment, her symptoms were improving, and she denied needing analgesics (Tr. 26 (citing Tr. 508-21)). The physical therapy notes that the ALJ discussed also note the plaintiff's abilities with regard to different functions such as standing (Tr. 511, 519). Significantly, physician's assistant Ms. Ho noted that the plaintiff's back pain had resolved with physical therapy in May 2012 (Tr. 359-62). Thereafter, in January 2013, the plaintiff had a consultative examination in which she demonstrated a normal range of motion in the lumbar spine, a normal gait with no assistive device, and 5/5 strength throughout her extremities (Tr. 27-28; *see* Tr. 534-37). The ALJ further noted that in February and June 2013, the plaintiff exhibited a normal range of motion, muscle strength, and stability in all extremities with no pain upon inspection (Tr. 27-28; *see* Tr. 549, 574). The ALJ also noted the plaintiff's conservative treatment for her back pain and the fact that there was never a recommendation for surgery, a TENS Unit, or a back brace – which is

17

indicative that her symptoms were not as disabling as alleged (Tr. 27-28). With regard to her right arm, the ALJ pointed out that the plaintiff did not exhibit any right upper extremity deficiencies at a January 2013 consultative evaluation, evidenced by her normal range of motion in her right shoulder and wrist and 5/5 grip strength (Tr. 28).

Here, the ALJ also gave great weight to examining orthopaedic consultant Dr. Bell's opinion that the plaintiff did not have back pain that would limit her from working and even assessed additional postural limitations due to the plaintiff's reports of back pain and the positive straight leg raising test at the examination (Tr. 28-29; *see* Tr. 537). The ALJ also gave great weight to the state agency physician assessment with regard to the plaintiff's physical abilities (Tr. 29). Dr. McCall assessed standing, walking, and lifting limitations in line with the ALJ's assessment (*see* Tr. 77). Dr. McCall also detailed the benign findings from the consultative assessment in his conclusions (Tr. 77). The ALJ's reference to Dr. McCall's RFC assessment also contributes to his analysis of the plaintiff's limitations. *See Schlossnagle v. Colvin*, C.A. No. 15-935, 2016 WL 4077672, at *8 (D. Md. Aug. 1, 2016) (recognizing that ALJ may satisfy function-by-function analysis by referencing state agency physician) (citing *Herren v. Colvin*, C.A. No. 1:15-CV-00002-MOC, 2015 WL 5725903, at *5 (W.D. N.C. Sept. 30, 2015)).

Based upon the foregoing, the undersigned finds no error in this regard.

### *Subjective Complaints*

The plaintiff next argues that the ALJ failed to properly consider her subjective complaints (pl. brief 10-14). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . .

18

> It is only after a claimant has met her threshold obligation of
> showing by objective medical evidence a medical impairment
> reasonably likely to cause the pain claimed, that the intensity
> and persistence of the claimant's pain, and the extent to which
> it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996) (citations and internal quotation marks omitted) (emphasis in original).  In *Hines v. Barnhart*, a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d 559, 565 (4th Cir. 2006).  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id*. at 564 (quoting SSR 90-1p, 1990 WL 300812).  The court further acknowledged:

> While objective evidence is not mandatory at the second step
> of the test, "[t]his is not to say, however, that objective medical
> evidence and other objective evidence are not crucial to
> evaluating the intensity and persistence of a claimant's pain
> and the extent to which it impairs her ability to work. They most
> certainly are. Although a claimant's allegations about her pain
> may not be discredited solely because they are not
> substantiated by objective evidence of the pain itself or its
> severity, they need not be accepted to the extent they are
> inconsistent with the available evidence, including objective
> evidence of the underlying impairment, and the extent to which
> that impairment can reasonably be expected to cause the pain
> the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements

about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 16-3p[4], 2016 WL 1119029, at *5 ("[W]e will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual. A report of minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on" in evaluating the claimant's subjective symptoms. *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 16-3p states that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms. " 2016 WL 1119029, at *9. The factors to be considered by an ALJ in evaluating the intensity, persistence, and limiting effects of an individual's symptoms include the following:

---

[4]SSR 16-3p supersedes SSR 96-7p. The ruling eliminates the use of the term "credibility" and clarifies that subjective symptom evaluation is not an examination of an individual's character. 2016 WL 1119029, at *1. The effective date of SSR 16-3p is March 28, 2016. *See* 2016 WL 1237954, at *1. While the ALJ issued his decision prior to the effective date of SSR 16-3p, the two-step process and factors for evaluating a claimant's subjective symptoms remains substantially the same as that for assessing the credibility of a claimant's statements under SSR 96-7p.

(1) the individual's daily activities;

(2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3) factors that precipitate and aggravate the symptoms;

(4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id*. at *7.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

Here, the ALJ found that while the plaintiff's impairments could reasonably be expected to cause her alleged symptoms, her statements concerning their limiting effects were not entirely credible (Tr. 27). The ALJ gave several reasons for not fully crediting the extent of the plaintiff's complaints (Tr. 26-28).  Specifically, the ALJ noted that the plaintiff's reports to her treating and examining physicians, as well as findings upon objective examination, were generally inconsistent with the plaintiff's testimony of such significant pain and dysfunction (Tr. 27). The ALJ noted that the plaintiff has been prescribed and taken appropriate medications for her alleged impairments, and the medical records revealed that the medications have been relatively effective in controlling the plaintiff's symptoms (Tr. 27). For example, as the ALJ recognized, with regard to the plaintiff's back, treatment notes from February to May 2012 showed that the plaintiff's symptoms improved with pain medications and physical therapy (Tr. 27; *see* Tr. 359-62, 510, 515). In addition, the ALJ pointed out that in January 2013, the plaintiff exhibited a normal range of motion

throughout the lumbar spine, a normal gait, and 5/5 strength in her extremities (Tr. 27, 536). Similarly, in February and June 2013, the medical records reflect that the plaintiff exhibited a normal range of motion, muscle strength, and stability in all extremities (Tr. 27; *see* Tr. 549, 574). Further, the ALJ highlighted the plaintiff's conservative course of treatment where she was never recommended for back surgery, a TENS Unit, epidural steroid injections in her back or even a back brace (Tr. 28).

With regard to the plaintiff's claim of pain from breast cancer, as late as January 2013 in the consultative examination, the plaintiff did not exhibit any upper extremity deficiencies where she had a normal range of motion in her right shoulder, arm and wrist, and 5/5 grip strength (Tr. 28; *see* Tr. 536). Additionally, the ALJ noted that there was no evidence of masses or dominant lesions at any followup examinations (Tr. 549-49). Overall, the ALJ noted that physicians' reports failed to reveal the type of significant clinical and laboratory abnormalities one would expect if the plaintiff's symptoms were genuine (Tr. 28).

Moreover, the ALJ recognized that, given the plaintiff's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of permanent restrictions placed on the plaintiff by a treating doctor (Tr. 28). However, he noted that a review of the records in this case revealed no restrictions recommended by any treating or examining clinician (Tr. 28). To the contrary, Dr. Bell, the consultative examiner, found that the plaintiff's back issues should not interfere in her ability to work (Tr. 537).

In assessing the extent of the plaintiff's subjective complaints, the ALJ also pointed out the plaintiff's activities of daily living were inconsistent with her allegations of such significant functional limitations, where she reported that she was able to take care of personal hygiene independently, live alone, prepare simple meals, fold laundry, perform some minor household chores, go outside once or twice per week, ride in a car, use public transportation, shop in stores, pay bills, count change, handle a savings account, use a

22

checkbook/money order, watch television, do word puzzles, and talk and visit with friends and family several times per week, activities which generally reveal functioning at a greater level than the plaintiff alleged (Tr. 27; *see* Tr. 206-213, 223-30).

The plaintiff takes issue with the way that the ALJ described her activities and argues that the ALJ mischaracterized them. The ALJ noted that the plaintiff lived alone (Tr. 27). At the administrative hearing, the plaintiff testified, "I live by myself, but my nephew has been living with me to help me out as much as he can" (Tr. 38), and in a function report she reported that she lived with her boyfriend (Tr. 223). In a function report dated September 2012, she checked that she lived in an apartment and did not specify that she lived with anyone else (Tr. 206). The plaintiff reported that she could microwave meals, which is consistent with the ALJ's characterization that she could make simple meals (Tr. 45, 225). She also reported going shopping and can fold clothes for a short amount of time before needing a break (Tr. 46). This again is consistent with the ALJ's recitation of the plaintiff's activities (Tr. 27).  She reported that she goes out twice a week for shopping, and her girlfriend drives and helps her with shopping (Tr. 209). The plaintiff further reported that she watches television and visits with friends who come to her house (Tr. 210).  The undersigned finds no error in the ALJ's characterization of the plaintiff's daily activities, and it was a proper consideration in the evaluation of the plaintiff's subjective complaints. *See* SSR 16-3P, 2016 WL 119029, at *7; 20 C.F.R. §§ 404.1529(c), 416.929(c)

The ALJ also noted that the plaintiff's physicians recommended her for a cholecystectomy and physical therapy for her right arm, but she testified that she could not afford treatment or surgery.  However, the ALJ pointed out that the evidence revealed that the plaintiff continued to buy cigarettes and smoke heavily (Tr. 28). He also found that such behavior was notable due to her history of breast cancer and her doctor's routine instructions on smoking cessation (Tr. 28). The plaintiff argues that "[t]he ALJ cannot seriously have thought that because [the plaintiff] could have saved her cigarette money

23

and had $13,000 to have her gallbladder taken out nor the money to afford physical therapy" (pl. brief at 12-13).

The undersigned finds no error in the ALJ's consideration of the plaintiff's use of cigarettes as one factor in the analysis of her subjective complaints. An individual's failure to follow prescribed treatment is an appropriate consideration in evaluating whether symptom intensity and persistence affect the individual's ability to perform work-related activities. SSR 16-3P, 2016 WL 1119029, at *8. However, the ALJ must consider possible reasons for failure to comply with the prescribed treatment. *Id.* at *8-9. The Fourth Circuit has found that a "claimant may not be penalized for failing to seek treatment he cannot afford . . . ." *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986). Here, the ALJ specifically considered the plaintiff's inability to afford certain treatment as a reason for her noncompliance. However, the ALJ felt this claim was not credible given that the plaintiff continued to buy cigarettes and smoke heavily (Tr. 28). "A claimant's use of income to purchase cigarettes can undercut his allegations that he is unable to afford treatment." *Hill v. Colvin*, C.A. No. 7:14-cv-171-D, 2015 WL 5147604, at *6 (E.D.N.C. Aug. 10, 2015), report and recommendation adopted by 2015 WL 5164957 (E.D.N.C. Sept. 2, 2015). *See also Magwood v. Astrue*, C.A. No. 6:10–2936–MBS–KFM, 2011 WL 6257159, at *8 (D.S.C. Nov. 21, 2011) (noting that the ALJ considered the plaintiff's claim that he could not afford treatment, but found the claim was not credible because the plaintiff earned money running errands and was able to buy cigars and alcohol), report and recommendation adopted by 2011 WL 6257138 (D.S.C. Dec. 14, 2011); *Mayle v. Astrue*, C.A. No. 9:06-3048 CMC-GCK, 2007 WL 4285383, at *21 (D.S.C. Dec. 3, 2007) (rejecting a similar argument to the one made here because "[t]he record also showed that the plaintiff consistently had the resources to obtain cigarettes"). Here, the ALJ recognized the plaintiff's claims that she could not afford the treatment, but pointed out that she was able to afford cigarettes, which

24

went directly against her treatment recommendations. In any event, as discussed above, this was simply one factor of many that the ALJ considered in his analysis.

Based upon the foregoing, the undersigned finds no error in the ALJ's consideration of the plaintiff's subjective complaints.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 3, 2017
Greenville, South Carolina

25